**Dr. Harry H. Asher, Plaintiff-Appellant, v. Dr. William B. Stromberg, Jr., et al., Defendants-Appellees.**

**Gen. No. 50,364.**

First District, Second Division.

December 13, 1966.

267

James A. Dooley, of Chicago, for appellant.

■■■■■■■■■■■

Kirkland, Ellis, Hodson, Chaffetz & Masters, of Chicago (Charles M. Rush and John M. O'Connor, Jr., of counsel), for appellees.

MR. JUSTICE LYONS delivered the opinion of the court.

This is an appeal from a judgment entered in favor of defendants after a verdict of not guilty was returned by a jury.

Plaintiff, Dr. Harry H. Asher, is a dentist practicing in Chicago, Illinois. Defendants are a group of doctors, specializing in hand surgery, affiliated with Passavant Hospital. Dr. Michael Mason, now deceased, was a member of the group.

Plaintiff, a practicing dentist for 33 years, had occasion to x-ray the dental structures of many patients. From 1931 to 1941, it was his custom to hold the x-ray plate in the patient's mouth with his left index finger. In 1958, plaintiff developed a condition of radiation dermatitis and experienced a callous on his left index finger, which would break down and heal spontaneously. Radiation dermatitis is a condition resulting from excessive exposure to x rays and as a result the cellular structure of the skin breaks down and the underlying blood vessels are destroyed so that nourishment to the skin is cut off. Radiation injury is a source of skin cancer. There are several types of skin cancer, all of which destroy tissues in the body. One type is squamous cell cancer. When a squamous cell cancer has a hand or finger as its primary site, the secondary site of its spread is in the lymph nodes located in the armpit. In discovering the presence of skin cancer, the medical profession is in accord that the only sure way is by the performance of a biopsy. A biopsy is the removal of a small portion of tissue for microscopic examination.

Plaintiff first visited defendant, Dr. Koch, in the spring of 1958, at which time Dr. Koch suggested that the

callous be removed from the finger and a skin graft be performed to prevent any further breakdown of the skin. The operation was performed at which time the callous was excised and skin taken from the thigh was grafted over the wound. The excised callous was sent in its entirety to a pathologist for examination or biopsy. There was no finding of malignancy. Plaintiff returned to the hospital for a further examination. The skin graft did not take and on August 18, 1958 further surgery was performed to accomplish another skin graft. Plaintiff concedes that the 1958 treatment is not the basis for his cause of action.

In July of 1961, plaintiff noticed a redness in the lower third of the same finger. Plaintiff contends he consulted and was examined by Dr. Stromberg in the fall of 1961 and that he thereafter saw Dr. Stromberg on five or six occasions. Defendants contend, however, that plaintiff first consulted Dr. Stromberg on February 13, 1962. The examination by Dr. Stromberg revealed that the skin on plaintiff's finger had cracked open. Dr. Stromberg advised plaintiff that he would have to have another operation, either a split-thickness graft as before, or a pedicle flap graft from the next finger. Dr. Stromberg suggested that an amputation might be advisable. According to plaintiff, he asked if there was any malignancy and was told there was absolutely none. This was denied by Dr. Stromberg. Dr. Stromberg's version, at the trial, was that he pointed out that the index finger was essentially a useless digit, due to the extent of the ulcer, stiffness and the lack of sensation. Dr. Stromberg advised plaintiff to clean the area with soap and water.

Plaintiff continued to see Dr. Stromberg several times a week and testified, at the trial, that Dr. Stromberg told him on these occasions that there was no malignancy. Plaintiff stated that Dr. Koch and Dr. Stromberg proposed that another split-thickness graft be performed. Dr. Stromberg performed the skin

271

graft. He took no steps to determine whether there was any malignancy present. On April 1, 1962, and on subsequent visits, skin was snipped from the edges of the latest graft. Dr. Stromberg testified that he again recommended the removal of the finger. Plaintiff denies that this recommendation was made. Testimony was elicited from defendant, Dr. Stromberg, under section 60 of the Civil Practice Act, that on April 2, 1962, while plaintiff was hospitalized for pneumonia, he was given a physical examination by a fourth-year medical student at Northwestern University and there was found in the lymph nodes, one moveable, nontender smooth lymph node, one centimeter in diameter, palpated in the left axilla. Dr. Stromberg admitted that one of the methods in which cancer in the finger can be demonstrated as a secondary symptom, is discovery of such a lymph node in the armpit lymph glands. He further stated that during this hospitalization between April 2 and April 7, 1962, that he had all the hospital records and was familiar with their findings and that he did nothing to determine whether or not the examination report meant there was any malignancy in the finger he was treating. On May 8, 1962, plaintiff was informed that the operation was not a success and that a pedicle flap graft would have to be performed.

On May 10, 1962, plaintiff consulted with Dr. Wayne Slaughter, who sent him to Dr. Danely Slaughter, for multiple biopsies. Biopsies of tissue removed from the ulcerated area were performed and revealed the presence of cancer, specifically a squamous cell carcinoma. On learning of the presence of cancer, Dr. Danely Slaughter informed plaintiff that the finger and the head of the metacarpal would have to be removed and surgery for that purpose was performed on May 22, 1962. While operating, Dr. Danely Slaughter discovered that the cancer cells had spread beyond the finger and the operation was halted in order to get the plaintiff's consent to

remove more than the finger. A subsequent operation resulted in the amputation up into the forearm when the biopsies showed the presence of cancer in that area. A subsequent examination of plaintiff revealed enlarged lymph nodes in the armpit, which was indicative that cancer cells had reached this area. The nodes were removed for biopsy purposes and it was determined that they contained metastic cancer. The forequarter operation was performed, which resulted in the removal of the entire arm and shoulder of plaintiff. Since the latter operation and up to the time of the trial, plaintiff has been observed and treated by Dr. Danely Slaughter.

Plaintiff's theory of the case is

(1) that defendants failed to meet or overcome plaintiff's prima facie case and thus the trial court erred in refusing to direct a verdict for plaintiff,

(2) that even if some defense was made which warranted submission of the case to the jury, the verdict of the jury was against the manifest weight of the evidence,

(3) that prejudicial error was committed by the trial court in

(a) failing to weigh the evidence,

(b) instructing the jury on the issue of contributory negligence and

(c) in excluding a statement of Dr. Stromberg, wherein he admitted he was at fault.

Defendants' theory of the case is

(1) that the verdict was proper in that the evidence revealed

(a) that there was no malpractice on the part of the doctors in that the school of hand

273

experts to which they belonged did not advocate partial biopsies,

(b) that the injury was not the proximate cause of the alleged negligent acts,

(c) that plaintiff's condition was caused by his own contributory negligence, and

(2) that no prejudicial error was committed by the trial court in that

(a) the statement of the trial court did not indicate an inability to weigh the evidence,

(b) the jury instruction on contributory negligence was proper and

(c) the exclusion of the statement of Dr. Stromberg, wherein he admitted he was at fault, was not erroneous.

We disagree with plaintiff's first contention that defendants failed to meet or overcome plaintiff's prima facie case and that the trial court erred in refusing to direct a verdict for plaintiff. There was sufficient evidence introduced by defendants that the school of medicine to which they belong advocates that it is good medical practice that a biopsy be performed at the time of surgery. There was testimony introduced that it is customary, in cases involving suspect lesions of the hand to submit, for examination, a piece of tissue which is a result of the complete excision of the lesion rather than submit a fragment.

We disagree with plaintiff's second contention that the verdict of the jury was against the manifest weight of the evidence even though there was a statement by the trial judge, during the course of the hearing on plaintiff's post-trial motion, indicating surprise at the verdict and that the trial court would have held otherwise.

Plaintiff also contends that the trial court, by its statement, erroneously concluded that it had no duty or power to weigh the evidence. We do not agree with plaintiff. A consideration of the court's complete remarks shows that, while he stated he would have held otherwise than did the jury, he did not indicate the interpretation plaintiff advances. The complete statement of the trial judge in regard to plaintiff's contention appears as follows:

> But the principal point relied on with respect to the verdict being against the weight of the evidence caused me a great deal of worry. I was surprised when the verdict came in. If I were a juror I would have held otherwise. I think possibly a good deal of my worry and doubt arises from the very nature of these actions. I always considered it rather anomalous submitting these technical questions, or medical questions to the jury, the laymen, and yet we see experts differ.
>
> I conclude, maybe a community judgment of twelve laymen isn't too bad an opinion. I state I would have held otherwise if I were a juror.
>
> Then the question arises, take the Court's responsibility in the case, the present posture of the case. I don't believe I can go as far as Mr. Dooley has in arguing that there was a complete absence of any evidence tending to refute the prima facie case made by the plaintiff.
>
> It seems to me that if I were to hold that the plaintiff was entitled to a new trial in this case at this present posture of the case or in the alternative to maybe enter judgment notwithstanding the verdict, the question of liability, just order a new trial on the question of damages, I would have to be saying as a matter of law that what these doctors did here made out—practically made out a conclusive

275

case of liability, based on the failure to take a biopsy.

I don't gather that at all from the testimony that I heard, and I do not know whether I, as a judge, can go so far as to hold that it was proved by the manifest weight of the evidence that it was negligence if the biopsy was not performed.

I have to await the ruling of a higher court.

So that to summarize—Well, I would have held otherwise. *I cannot as a matter of law say that this verdict of the jury is so irrational, so completely out of line that it must have been the result of prejudice or misunderstanding, misconception of the instructions given by the court, and I have to see these question [sic] answered in the affirmative before I, sitting here, could grant a new trial.* (Emphasis supplied.)

It is with something of regret that I deny the motion for a new trial, but I think I am following the law consistent with the principles enunciated instead of substituting my judgment. If I were on the jury I would have fought vigorously for the contrary.

These remarks clearly indicate that the trial court thought the verdict was rational. The remarks of the trial judge that he would have found differently if a juror, could very well have taken place because of his knowledge of an alleged admission, knowledge that the jury did not possess.

■ ■ Plaintiff next contends that error was committed by the trial court by submitting to the jury an instruction, requested by defendant, that the verdict should be for defendant if plaintiff was guilty of negligence. It is plaintiff's position that the issue of contributory negligence cannot be submitted to a jury in a malpractice case. We disagree with plaintiff. It is true

that where the fault of the patient occurs subsequent to the fault of the physician and merely aggravates the injury inflicted by the physician, it only affects the amount of the damages recoverable by the patient. Wesley v. Allen, 235 Ill App 322 (1925). Here, however, defendants introduced evidence that the fault of the patient occurred prior to the fault of the physician and thus the instruction requested by defendant was proper.

Finally, plaintiff contends that it was error to exclude the extrajudicial admission of Dr. Stromberg. A statement was allegedly made by Dr. Stromberg, testified to by plaintiff and his wife, that he told them that the result had not been a good one, and that as far as he was concerned he may have been at fault and that he had an insurance policy of $100,000 for malpractice. An offer of proof of this statement was made by plaintiff to the court out of the presence of the jury. Discussion pertinent to this offer of proof reads as follows:

> Mr. Dooley: Judge, while we are here I might as well make an offer of proof and the offer of proof is that if the witness, Dr. Stromberg, were allowed to testify he would testify that in the early part of May before the patient had seen Dr. Slaughter he and Mr. and Mrs. Asher had dinner at the International House and that he told them that he realized that the result had not been a good one; that he further said to them that—I am trying to be exact as to what he said.
>
> He further said to them that as far as he was concerned he may have been at fault and that he had an insurance policy of $100,000 for malpractice. That is what he told them.
>
> Mr. Rush: I don't know what basis you have for saying that. That isn't what he said in his deposition, but I object to the offer.

Mr. Dooley: What do you mean?

The Court: Mr. Rush is saying he doubts whether the doctor, if so called, would so testify. I suppose Dr. Asher would so testify, would he, or Mrs. Asher?

Mr. Dooley: Dr. Asher would certainly so testify. In fact, Dr. Stromberg admits that. The only thing he denies in his deposition is the amount of the policy.

Mr. Rush: That isn't so, as I recall it.

Mr. Dooley: He admits he brought up the question of his policy.

The Court: I think I would permit evidence of a statement by Dr. Stromberg to the effect that he may have made a mistake. Is that the wording?

Mr. Dooley: That is it, and he volunteered—

The Court: But I don't think—I think I would have to cut that short. It seems to me the prejudice would far outweigh the probative value, but I would let in an admission under the theory of admission against interest the statement that he thinks he may have erred or made a mistake.

Was it any more specific than that? Did he indicate in that respect he had erred? Was it in the actual performance of the work? Was it in the failure to take a biopsy?

Mr. Dooley: No. He didn't go into the details. They went and told him they were going to see another doctor. That was the purpose of this meeting. They went and they wanted to explain it to him and he admits that.

The Court: I can well understand under those circumstances a statement about carrying malpractice

insurance may be a jocose statement, or one of bravado or it wouldn't have had—Would it come in under the theory of an admission against interest?

Mr. Dooley: He admits it.

The Court: It may have been designed to soothe their ruffled feelings or tell them, "If you want to sue, go ahead. I have a policy."
 I don't think it would be wise to let that kind of evidence, that kind of remark, go to the jury.

Mr. Dooley: You know this doctor never had any policy which provided for any doctor fees.

The Court: I thought—.

■ It has long been established that general admissions of liability are properly received into evidence in malpractice actions. Johnson v. Marshall, 241 Ill App 80 (1926).

■ In reply to plaintiff's contention that this admission should have been allowed by the trial court, defendants contend that the alleged admission was not really an admission because all that Dr. Stromberg allegedly stated was that "as far as he was concerned he *may* have been at fault and that he had an insurance policy of $100,000 for malpractice." (Emphasis supplied.) We disagree with defendants. We find that the above language could constitute an admission.

■■ Furthermore, counsel for defendants objected to the offer only on the grounds that the alleged admission was not what Dr. Stromberg said in his deposition. Such was the only ground assigned. A specific objection is a waiver of all other objections. Town of Cicero v. Industrial Commission, 404 Ill 487, 495, 89 NE2d 354 (1949).

■ Defendants' second answering argument to plaintiff's contention is that the court properly exercised

its discretion by its refusal to allow the question of insurance to be injected into the case because its prejudice would outweigh the probative value of Dr. Stromberg's statement. We disagree with defendants. Notwithstanding the well defined principle that a defendant cannot show whether a person has a policy of insurance, we feel that the offer of proof that Dr. Stromberg's statement be admitted into evidence should have been sustained. In Seyferlich v. Maxwell, 28 Ill App2d 469, 171 NE2d 806 (1961), where the admissibility of evidence relating to insurance coverage was thoroughly discussed, it was stated at page 476:

> . . . It may also be introduced in evidence when a party makes a statement amounting to an admission of liability and the jury is thereby incidentally apprised of the insurance coverage. 4 ALR2d 781, Garee v. McDonnell, (CCA 7th Ill,) 116 F2d 78. . . .

The trial judge could have admitted the alleged admission and excluded the reference to insurance. Furthermore, there was no duty on plaintiff to recommend to the trial judge that he adopt the above procedure. Finally, defendants themselves brought up the question of insurance during the course of the trial and thus took away any prejudicial effect.

Defendants' final argument, that the offer of proof was insufficient in that no question concerning the alleged admission was asked of anyone, is without merit. Defendants' counsel recognized the statement of Dr. Stromberg as an offer of proof when he objected to the offer. Moreover, the court made inquiry as to whether Dr. and Mrs. Asher would testify, to which plaintiff's counsel replied that they would. This was more than a mere statement of counsel that he only desired to offer evidence. It was an affirmative statement that certain testimony would be presented to the court.

After careful scrutiny of the entire record in this case, it is apparent that it is a close case on its facts as is evidenced by the statements of the trial court at the hearing on the post-trial motion. The court stated, "I was surprised when the verdict came in. If I were a juror I would have held otherwise . . ." and "I state I would have held otherwise if I were a juror . . ." and "if I were on the jury I would have fought vigorously for the contrary." It is apparent, however, that the only thing that the Judge knew and the jury did not know, was the alleged admission of defendant, Dr. Stromberg. We are, therefore, constrained to believe that had the jury heard the admission, they could have felt the same way about the verdict as the Judge.

For the above reasons, we believe the case should be remanded for a new trial. Therefore, the judgment of the lower court is reversed and cause remanded with directions to proceed in a manner not inconsistent with this opinion.

Judgment reversed and cause remanded for a new trial.

BRYANT, P. J., concurs.

BURKE, J., dissenting:

The jury verdict was for the defendants. The evidence strongly supports this verdict. The adequacy of the care exercised is to be judged by the rules and principles of the school of medicine to which the defendants belong, the American Association of Hand Surgeons, which believes and teaches that the cancer can be spread in treating a suspected hand by snipping off pieces of tissue, and that the total infected area must be excised and sent to a pathologist. Defendants' actions were in strict compliance with their school of medicine.

I agree with defendants that even if they were unskill-ful or negligent, their professional conduct was not the proximate cause of the injury of which plaintiff com-plains. The evidence is uncontradicted that when plaintiff came to Dr. Stromberg, in February of 1962, the cancer was already so far advanced that his hand and forearm could not have been saved. Dr. Danely Slaughter, plain-tiff's witness, who performed the amputation of plain-tiff's hand and part of his forearm, testified that in his opinion, on February 13, 1962, when plaintiff went to Dr. Stromberg, the cancer was already into the arm (indi-cating below the wrist watch) and that it would not have done any good to have taken off the finger at that time; the whole hand and a part of the arm would have had to come off then. He thought the lesion had probably begun to change to malignant a year before he first saw plain-tiff on May 8, 1962.

Drs. Wheelock, Bell and Stromberg, testified that on February 13, 1962, the cancer was at least as far as plaintiff's wrist. In Dr. Wheelock's opinion, the squamous cancer, which is slow growing, must have been in existence for one and a half to two years. Dr. Stromberg was not responsible for any condition plaintiff had when he came to see him, nor for anything that would inevitably result from his condition when he came to see Dr. Stromberg. The evidence is uncontradicted that plaintiff's hand would have had to be amputated on that date.

I agree that the issue of contributory negligence was properly submitted to the jury. In his complaint the plaintiff alleged that he was in the exercise of due care. The plaintiff also submitted and the court gave an in-struction telling the jury that he (plaintiff) "claims that he was injured and sustained damages while exercising ordinary care." In the trial of the case the defendant recognized that one of the elements of the case was the proof of ordinary care.

It is interesting to note that when Dr. Danely Slaughter first observed the lesion, from just the appearance of it

alone he did not believe it was cancer; he thought probably it was not. It did not look to him like the usual type of cancer. On May 21 or 22, 1962, Dr. Danely Slaughter amputated the index finger and the head of the first metacarpal, or second. This is essentially the same operation Dr. Stromberg had recommended three times before. While Dr. Slaughter was performing the operation he learned that the cancer cells had spread. On May 8, 1962, when Dr. Danely Slaughter first examined plaintiff he found no evidence of any lymph node activity. He specifically noted that on his office chart on May 8. On June 18, the node activity was noticeable. Following this discovery Dr. Slaughter told plaintiff he was suspicious of the nodes. He suggested that plaintiff see some other surgeon and sent him to Dr. Gordon McNeer in New York City and let him take the responsibility.

The reversal and remandment for a new trial is allowed on the ground that a claimed admission of liability by Dr. Stromberg should have been introduced for consideration of the jury. In the discussion in chambers, the trial judge stated that he would let in the claimed admission, saying that he would "permit evidence of a statement by Dr. Stromberg to the effect that he may have made a mistake." The trial judge indicated that he would exclude the purported statement by Dr. Stromberg "that he had an insurance policy of $100,000 for malpractice." The attorney for plaintiff did not say whether he would rephrase his questions in accordance with the judge's indicated ruling. From the discussion in chambers it appears that plaintiff's attorney intended to prove the alleged admission by the testimony of Dr. Stromberg. The plaintiff at no time made a definite offer of proof. This subject was dropped and the trial went on. I am of the opinion that the trial judge was right in indicating that he would permit the part of the statement disclosing an admission, but would deny mentioning the insurance policy for malpractice. The fact that the physician had

283

an insurance policy for malpractice would not tend to show that defendant was guilty of malpractice. I do not think that this judgment supported by the evidence and following a trial by able and experienced lawyers and before an able and experienced judge should be set aside because of the discussion in chambers concerning an alleged admission. Furthermore, the claimed admission against interest by Dr. Stromberg would not be admissible against Drs. Koch and Bell. The judgment should be affirmed.